# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

SEAN ROBILLARD and SARA
DOMRES,

                Plaintiffs,

v.

GRACE KNUTSON and TROY
ENGER,

              Defendants.

Case No. 24-CV-1077-JPS

**ORDER**

In July 2025, Plaintiffs Sean Robillard ("Robillard") and Sara Domres ("Domres") (together, "Plaintiffs") filed their amended putative class action against Defendants Grace Knutson, the Director of Sex Offender Programs for the Wisconsin Department of Corrections ("WDOC"), and Troy Enger, administrator of the Division of Community Corrections of the WDOC ("Defendants"), under 42 U.S.C. § 1983, asserting violations of Plaintiffs' rights under the Fourth Amendment of the United States Constitution. ECF No. 31 at 1. Specifically, Plaintiffs allege that

> systemic deficiencies in the [WDOC's] policies and practices have caused the [WDOC's] Electronic Monitoring Center to issue arrest warrants for individuals on extended supervision who are suspected of having tampered with their GPS monitors without taking reasonable measures to confirm whether the suspected tampering alert is related to an equipment malfunction.

*Id.* at 2.

Now before the Court is Plaintiffs' motion for certification of a plaintiff class under Federal Rule of Civil Procedure 23(b)(2). ECF No. 13.

For the reasons discussed herein, the Court grants the motion, using its power under the law to refine the definition of the class. *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 825 (7th Cir. 2012) (citations omitted).

## 1.     BACKGROUND

Plaintiffs are both convicted sex offenders who are or were subject to GPS monitoring. ECF No. 31 at 8, 12. Plaintiffs allege that Defendants have implemented policies applicable to those on extended supervision who are subject to GPS monitoring, according to which, if there is a "tamper" or "strap" alert after hours, individuals are taken into custody without further inquiry into whether tampering actually occurred. *Id.* at 2. In challenging such policies on Fourth Amendment grounds, Plaintiffs move to certify a class defined as follows: "All individuals subject to GPS monitoring by the [WDOC] who are on extended supervision, parole[,] or another form of criminal supervision." *Id.* at 15.

## 2.     LEGAL STANDARD

Class action litigation is "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Califano v. Yamasaki*, 442 U.S. 682 (1979). For the Court to certify a proposed class, a plaintiff must satisfy the requirements of Federal Rule of Civil Procedure 23(a): numerosity, commonality, typicality, and adequacy of representation. More specifically, a plaintiff must show that:

(1) the class is so numerous that joinder of all members is impracticable;

(2) there are questions of law or fact common to the class;

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4) the representative parties will fairly and adequately protect the interests of the class."

Fed. R. Civ. P. 23(a)(1)–(4). Further, a class may only be certified if it meets one of the subsections of Rule 23(b). *Priddy v. Health Care Serv. Corp.*, 870 F.3d 657, 660 (7th Cir. 2017) (citing *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 345 (2011)). Where, as here, certification is sought under Rule 23(b)(2), proponents of the class must show that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2).

In addition to the Rule 23 requirements, class certification also requires, as a threshold matter, that the plaintiff prove that the class—and, by implication, the class definition—is "sufficiently definite that its members are ascertainable." *Jamie S. v. Milwaukee Pub. Schs.*, 668 F.3d 481, 493 (7th Cir. 2012) (citing *Oshana v. Coca–Cola Co.*, 472 F.3d 506, 513 (7th Cir. 2006)).

It is important to note that "Rule 23 does not set forth a mere pleading standard." *Dukes*, 564 U.S. at 350. Instead, the plaintiff "bears the burden of proving by a preponderance of the evidence all necessary prerequisites to the class action." *Id.* "This normally means that some discovery related to the class certification must take place." *Id.* Accordingly, when determining whether Plaintiffs have met their burden, "[t]he [C]ourt does not presume that all well-pleaded allegations are true for purposes of deciding the certification question." *Armes v. Sogro, Inc.*, No. 08-C-0244, 2011 WL 1197537, at *2 (E.D. Wis. Mar. 29, 2011) (citing *Szabo v. Bridgeport Machs., Inc.*, 249 F.3d 672, 676–77 (7th Cir. 2001)); *Priddy*, 870 F.3d at 660 (noting that the Court does not conduct its class certification inquiries in a "fact-free

zone"). "Rather, it should look beneath the surface of a complaint to conduct the inquiries identified in Rule 23 and exercise the discretion it confers." *Armes*, 2011 WL 1197537, at *2 (quoting *Szabo*, 249 F.3d at 677 (internal bracketing and quotation marks omitted)). That does not mean that class certification is a "dress rehearsal for the trial on the merits." *Messner*, 669 F.3d at 811 (citing *Schleicher v. Wendt*, 618 F.3d 679, 685 (7th Cir. 2010); *Kohen v. Pac. Inv. Mgmt. Co.*, 571 F.3d 672, 677 (7th Cir. 2009); *Payton v. County of Kane*, 308 F.3d 673, 677 (7th Cir. 2002)). But ultimately, "certification is proper only if 'the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied.'" *Dukes*, 564 U.S. at 350–51 (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160 (1982)).

### 3.    ANALYSIS

#### 3.1    The Class Definition Problem

Before considering whether the proposed class meets the Rule 23 requirements for certification, the Court pauses to rectify a manifest problem with the definition of the proposed class, which includes approximately 2,700 individuals. ECF No. 39 at 6. Specifically, Plaintiffs plan to define the class as "all persons currently or in the future subject to GPS monitoring by the Wisconsin Department of Corrections while on extended supervision (*e.g.*, parole or another form of criminal supervision)." *Id*. at 1. This definition, based on the record before the Court, leads to a class that would "include many members who could not bring a valid claim even under the best of circumstances." *Messner*, 669 F.3d at 825 (citing *Oshana*, 472 F.3d at 514).

Indeed, Plaintiffs have not argued that all—or even most—of these individuals have been or likely will be harmed by the "tamper" and "strap"

alert policies challenged in this case. At the Court's request, the parties provided further analysis of the frequency of after-hours "tamper" and "strap" alerts resulting in apprehension requests, the frequency of "automatic" custodial holds following such requests, and the number of referrals for prosecution based on sufficient evidence of actual tampering. ECF No. 44. According to this analysis, between 2022 and 2025, there were "1,340 persons whose GPS monitors generated after-hours 'strap' or 'tamper' alerts that resulted in the issuance of an apprehension request . . . and a . . . teletype." *Id.* at 1. Of those 1,340 warrants and teletypes issued, 1,013 custodial holds actually ensued. *Id.* And within that subgroup, a total of 10 individuals were ultimately referred for prosecution for potential criminal charges related to tampering. *Id.* at 2.

Assuming an equal distribution across years, that means that in any given year, approximately 447 individuals' GPS monitors generated after-hours alerts, approximately 338 were taken into custody, and approximately 3 were referred for prosecution. These figures are a far cry from the 2,700 people on GPS monitoring and under some form of state supervision at a given point in 2025. Even assuming *all* of the individuals not referred for prosecution were subject to malfunctions and did not in fact tamper with their GPS monitors, these numbers are nowhere near 2,700.

True, a "class will often include persons who have not been injured by the defendant's conduct," because "it is almost inevitable . . . at the outset of the case [that] many of the members of the class may be unknown, or if they are known still the facts bearing on their claims may be unknown." *Kohen v. Pac. Inv. Mgmt. Co.*, 571 F.3d 672, 677 (7th Cir. 2009). Even so, there is an "appropriate and limited use of evidence at the certification stage," *id.* (citing *Schleicher v. Wendt*, 618 F.3d 679, 685 (7th Cir. 2010)), and that is to

determine whether this is a case where members *were not* injured by the Defendants' conduct or, instead, *could not have been* injured by Defendants' conduct. As the Seventh Circuit explained,

> This distinction is critical for class certification purposes. As explained above, if a proposed class consists largely (or entirely, for that matter) of members who are ultimately shown to have suffered no harm, that may not mean that the class was improperly certified but only that the class failed to meet its burden of proof on the merits. If, however, a class is defined so broadly as to include a great number of members who for some reason could not have been harmed by the defendant's allegedly unlawful conduct, the class is defined too broadly to permit certification.

*Messner*, 669 F.3d at 824 (internal citations omitted). Again, the Court cannot certify the class when it includes "members who could not bring a valid claim even under the best of circumstances." *Id.* at 825 (citing *Oshana*, 472 F.3d at 514). What constitutes too many class members immune from injury for certification purposes is highly case-specific, *id.*, but this Court is persuaded that where, within a given year, only 12% of the proposed class could possibly have a claim (the presumed 335 taken into custody for a "tamper" or "strap" alert but not referred for prosecution, as compared to the 2,700 on GPS monitoring), the class seems facially overinclusive—that is, too broad to be certified as it stands.

But the issue of an over-inclusive class "can and often should be solved by refining the class definition rather than by flatly denying class certification on that basis." *Id.* at 825 (collecting cases). Accordingly, the Court can and will narrow the class in this case as follows:

> All individuals on extended supervision, parole, or another form of criminal supervision by the Wisconsin Department of Corrections affected by the policy of automatically issuing

arrest warrants for individuals subject to GPS monitoring, within the applicable statute of limitations, where the word 'affected' refers to those individuals who were taken into custody as a result of an after-hours 'tamper' or 'strap' alert on a weekend or holiday and who were not subsequently referred for prosecution for tampering with their GPS monitors.

Based on the parties' joint submission, this should yield a class of approximately 1,000 individuals for the years 2022 to 2025.

In rewording the class in this way, the Court satisfies the remaining conditions the Seventh Circuit sets forth for class definitions. As noted earlier, "[o]ne threshold requirement is not mentioned in Rule 23, but is implicit in the analysis: that is, the plaintiff must demonstrate that the proposed class is 'adequately defined and clearly ascertainable.'" *Bussey v. Macon Cnty. Greyhound Park, Inc.*, 562 Fed. App'x. 782, 787 (11th Cir. 2014) (quoting *Little v. T–Mobile USA, Inc.*, 691 F.3d 1302, 1304 (11th Cir. 2012)) (internal quotation marks omitted).

The Seventh Circuit adopts a "weak" version of ascertainability, according to which the primary concern of the court is whether the class definition itself is adequate—that is, clear and based on objective criteria. *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 659 (7th Cir. 2015) (citations omitted). The Court is not concerned, by contrast, with whether it would be easy or difficult to identify particular class members. *Id*. Pursuant to this weak view, a class is sufficiently definite and ascertainable if it, first, "identif[ies] a particular group, harmed during a particular time frame, in a particular location, in a particular way." *Mullins*, 795 F.3d at 660 (citing *McLaughlin on Class Action*s § 4:2 and *Rodriguez v. Berrybrook Farms, Inc.*, 672 F. Supp. 1009, 1012 (W.D. Mich. 1987)). Second, a class satisfies the

requirements of definition and ascertainability if it is defined by objective criteria—generally satisfied if the class is defined "in terms of conduct (an objective fact) rather than a state of mind." *Id.* (citing *National Org. for Women, Inc. v. Scheidler*, 172 F.R.D. 351, 358–59 (N.D. Ill. 1997) and *Newberg on Class Actions* § 3:5)). Finally, classes that are defined in such a manner that "membership does not depend on the liability of the defendant" generally satisfy the Seventh Circuit's definition and ascertainability requirements. *Id.*

The class definition, as modified, satisfies these criteria. It identifies a particular group (those subject to GPS monitoring by the Wisconsin Department of Corrections who are on extended supervision, parole or another form of criminal supervision) harmed in a particular way (taken into custody as a result of an after-hours "tamper" or "strap" alert without being subsequently referred for prosecution for actually tampering with their GPS monitor) during a specific period (the period since such a policy has been in place but within the applicable statute of limitations) in particular areas (the state of Wisconsin). The class definition is not based on subjective criteria, but the specific conduct of the Defendants—namely, the alleged policy of automatic after-hours detentions based on "strap" or "tamper" alerts. Finally, the class definition does not create a fail-safe class in which "membership depend[s] on liability of the class." *Mullins*, 795 F.3d at 661. Here, if Defendants prevail, "*res judicata* will bar class members from re-litigating their claims." *Id.*

With this clearly and objectively-defined class standing as satisfactorily ascertainable, the Court will turn to a careful and balanced application of the Rule 23(a) and (b)(2) requirements.

### 3.2    23(a) Requirements

#### 3.2.1    Numerosity

With respect to numerosity, the Court considers whether the class is "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). While there is no express cut-off in terms of number, the Seventh Circuit has indicated that a class of forty members satisfies this requirement. *Swanson v. Am. Consumer Indus., Inc.*, 415 F.2d 1326, 1333 n.9 (7th Cir. 1969); *Orr v. Shicker*, 953 F.3d 490, 498 (7th Cir. 2020) ("[A] forty-member class is often regarded as sufficient to meet the numerosity requirement." (quoting *Mulvania v. Sheriff of Rock Island Cnty.*, 850 F.3d 849, 859 (7th Cir. 2017))).

Here, we know that the class consists of approximately 1,000 individuals,[1] the total number of individuals detained pursuant to an after-hours "strap" or "tamper" alert without referral for prosecution between 2022 and 2025. ECF No. 44. Presumably, the actual number is higher than this, as the challenged policy may well have been in effect before 2022, and new class members may be added so long as the policy remains in effect. But this number is sufficiently high to satisfy the numerosity requirement. True, as Defendants observe, numbers alone are not dispositive of whether joinder is impractical. ECF No. 40 at 6 (citing *Anderson v. Weinert Enters., Inc.*, 986 F.3d 773, 777 (7th Cir. 2021) *(*noting "[t]he key numerosity inquiry

---

[1] As presented, the parties stipulate that there 1,013 actual custodial holds for the 1,340 alerts for which a warrant and teletype notification was issued. ECF No. 44 at 1. Of those 1,340 alerts, a total of 10 individuals had their cases referred to prosecutors. *Id*. at 2. Indeed, whatever assumptions the Court makes about how many of those 10 individuals were one of the ones placed in a custodial hold, the Court still has approximately 1,000 individuals who were not prosecuted and, therefore, the proper subjects of this class action.

. . . is not the number of class members alone but the practicability of joinder")). However, in cases like this, the number is so large that the volume alone makes joinder impractical. *See Anderson*, 986 F.3d at 778 (noting that, in some cases, volume is dispositive). Accordingly, there is numerosity here.

### 3.2.2   Commonality

Commonality demands that "questions of law or fact common to the class" exist. FED. R. CIV. P. 23(a)(2). "Commonality requires the plaintiff to demonstrate that the class members 'have suffered the same injury,'" which "does not mean merely that they have all suffered a violation of the same provision of law." *Dukes*, 564 U.S. at 349–50 (quoting *Falcon*, 457 U.S. at 157); *Jamie S. v. Milwaukee Pub. Schs.*, 668 F.3d 481, 497 (7th Cir. 2012). The class' claims must "depend on a common contention" that is "of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Dukes*, 564 U.S. at 350. Additionally, it is not the number of common questions the class shares—even one will do—but whether class-wide proceedings will "generate common answers apt to drive the resolution of the litigation." Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. REV. 97, 132 (2009).

Plaintiffs, in essence, argue that the presence of a standard, across-the-board policy that has been applied to class members renders this case particularly amenable to common resolution. In reply, Defendants primarily argue as follows: "To find commonality on the record here, this Court would need to *assume* the Department has a policy that has *presumably* harmed or will *presumably* harm all individuals on extended supervision subject to GPS monitoring, even though there are ten different

alerts, Plaintiffs were only detained under two of those alerts (tamper and strap alerts), and even those two types of alerts are handled differently under the policy." ECF No. 40 at 14.

The class definition, as modified, answers Defendants' concerns. It is limited to those actually harmed by after-hours "tamper" and "strap" alert-based arrests, insofar as the class members are those taken into custody. The Court need not presume harm to the wider class of all those on supervision subject to GPS monitoring. It is only considering those taken into custody as a result of an after-hours "strap" or "tamper" alert, not the other eight alerts that Plaintiffs never mention and that otherwise have no relevance here; the "glue" question will be whether a departmental policy did in fact do away with the requirement of a reasonable suspicion analysis before custodial holds occurred and whether that policy was unconstitutional. Questions of this sort have been previously held sufficient for class certification purposes. *See Orr*, 953 F.3d at 494–95, 499 (holding that commonality was satisfied where the policy on medical protocols was the glue that held together the putative class*); Montoya v. Jeffreys*, No. 18 C 1991, 2020 WL 6581648, at *2–5, 10–11 (N.D. Ill. Nov. 10, 2020) (holding that commonality was satisfied where there was substantial evidence in the record of the challenged policy and of each named representative's individual claim).

Defendants' remaining arguments are not persuasive either. For instance, Defendants argue that Plaintiffs' claims are highly individualized, as the reasonable suspicion analysis hinges, at least in part, on the characteristics and behavior of the offender. ECF No. 40 at 12 (citing *United States v. Lenoir*, 318 F.3d 725, 729 (7th Cir. 2003) and *Knox v. Smith*, 342 F.3d 651, 657 (7th Cir. 2003)). But in a case such as this, the Court will not be

tasked with assessing whether reasonable suspicion in fact existed at the time of each custodial hold experienced by class members. Instead, the Court will be tasked with answering whether a reasonable suspicion analysis was undertaken *at all* before class members were taken into custody. To be sure, the facts here mirror those in *Scott v. Dart*, 99 F.4th 1076, 1091 (7th Cir. 2024). Just as the local government in that case decided not to keep an oral surgeon at the jail, Defendants here allegedly decided not to undertake a reasonable suspicion inquiry prior to placing individuals in custody following certain alerts. *Id*. As in that case, the legal question here "applies equally to all class members," and the plaintiffs "have offered evidence to show that the challenged policy causes systemic [legal issues] across the entire class." *Id*. As such, it does not matter that the reasonable suspicion inquiry is "inherently individualized." *Id*. (noting that the "district court's analysis boils down to the fact that medical care is inherently individualized. But that alone is not enough to preclude class certification.").

In sum, the core factual question here is whether Defendants had a policy that allowed for custodial holds following a "tamper" or "strap" alert without a reasonable suspicion analysis. If so, the core legal question is whether this violates the Fourth Amendment, regardless of whether reasonable suspicion would have been found in particular instances. These are questions common to all class members, and they are the very crux of the case. Thus, Defendants' counterarguments fall flat, and the Court is satisfied that commonality exists here.

### 3.2.3   Typicality

A class representative's claim is "typical" if it "'arises from the same event or practice or course of conduct that gives rise to the claims of other

class members and his or her claims are based on the same legal theory.'" *Keele v. Wexler*, 149 F.3d 589, 595 (7th Cir. 1998) (quoting *De La Fuente v. Stokely–Van Camp, Inc.*, 713 F.2d 225, 232 (7th Cir. 1983)). "Typical does not mean identical, and the typicality requirement is liberally construed." *Gaspar v. Linvatec Corp.*, 167 F.R.D. 51, 57 (N.D. Ill. 1996). It requires "enough congruence between the named representative's claim and that of the unnamed members of the class to justify allowing the named party to litigate on behalf of the group." *Spano v. The Boeing Co.*, 633 F.3d 574, 586 (7th Cir. 2011). While "some factual variations may not defeat typicality, the requirement is meant to ensure that the named representative's claims 'have the same essential characteristics as the claims of the class at large.'" *Oshana*, 472 F.3d at 514 (quoting *Retired Chicago Police Ass'n v. City of Chicago*, 7 F.3d 584, 597 (7th Cir. 1993)).

To assess the typicality of their claims, the histories of the named Plaintiffs, Robillard and Domres, should be briefly recounted. Plaintiff Robillard is currently on extended supervision after being convicted in 2017 of three counts of possession of child pornography. ECF No. 31 at 4. He is on state extended supervision until 2030. *Id.* at 9. He is required to wear a GPS monitor for life. *Id.* On a Saturday in April 2024, Robillard was taken into custody following a "tamper alert." *Id.* Robillard alleges that he had not tampered with the GPS device in any way and that no one from the Department of Corrections investigated matters of this sort before taking him into custody. *Id.* at 10. Robillard spent two nights in jail and was released the following Monday, though he missed an entire day of work. *Id.* at 10–12.

Domres was on extended supervision after being convicted in 2016 of two counts of Sex Assault of Student by School Staff. *Id.* at 4. She was

released from extended supervision in December 2024, but is similarly required to wear a GPS monitor for life. *Id.* at 12. On a Sunday in September 2024, Domres was taken into custody for allegedly tampering with her GPS device, though she alleges she had not tampered with it. *Id.* at 13. Due to the Labor Day weekend, she was held in custody until the following Tuesday. *Id.* at 13. Domres similarly missed a day of work due to the custodial hold. *Id.* at 15. "This was the second time [Domres] was arrested and force to spend more than one night in jail due to a malfunctioning GPS device while on supervision." *Id.* at 15.

Here, Robillard and Domres "alleged the same injurious conduct and requested the same modifications as the class at-large." *Lacy v. Cook County, Illinois*, 897 F.3d 847, 866 (7th Cir. 2018). Their essential claims—that they were on GPS monitoring while on extended supervision and subjected to a custodial hold pursuant to a "tamper" or "strap" alert without inquiry into whether tampering had actually occurred—represent the core of this case and the core of the revised class definition.

Defendants allege that Plaintiffs have not shown typicality. For one, they argue that different alerts are subject to different policies—only "tamper" and "strap" alerts "automatically" result in arrest warrants, whereas the eight other types of alerts require an attempt to contact the offender. ECF No. 40 at 16. But the Court has limited the class to those individuals taken into custody as a result of a "tamper" or "strap" alert; as such, all individuals, including Robillard and Domres, would have been subject to the alleged automatic warrant generation. The class will not encompass individuals who fall under any of the other alerts, so Robillard and Domres' claims need not be typical of those individuals. Their claims need only encompass—and, indeed, do encompass—those individuals

who, like Plaintiffs, had a "tamper" or "strap" alert and subsequent custodial hold.

Furthermore, Defendants argue that Domres is no longer part of the class, because she was discharged from extended supervision in December 2024. ECF No. 40 at 17–18 (citing ECF No. 31 at 12). Because she has been released from extended supervision and therefore is no longer subject to the challenged policy, she can only seek money damages; as such, her claim is not typical of the class, which seeks injunctive and declaratory relief. *Id.* at 18. Similarly, Defendants argue Robillard's claim is atypical because he seeks monetary damages, whereas the claim of the class is for equitable relief.

However, Defendants misunderstand what the typicality analysis requires. It is "not a demanding standard." *Balschmiter v. TD Auto Fin. LLC*, 303 F.R.D. 508, 526 (E.D. Wis. 2014); *see also Pope v. Harvard Banschares, Inc.*, 240 F.R.D. 383, 389 (N.D. Ill. 2006) (citing *Gaspar v. Linvatec Corp.*, 167 F.R.D. 51, 57 (N.D. Ill. 1996) (noting that typicality "does not mean identical" and that is a "liberally construed" standard). According to the Seventh Circuit, the typicality analysis "primarily directs the district court to focus on whether the named representatives' claims have the same essential characteristics as the claims of the class at large," meaning that "'it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and his or her claims are based on the same legal theory.'" *De La Fuente*, 713 F.2d at 232 (quoting H. Newberg, *Class Actions* § 1115(b) at 185 (1977) and citing *Resnick v. Am. Dental Ass'n*, 90 F.R.D. 530, 539 (N.D. Ill. 1981); *Edmondson v. Simon*, 86 F.R.D. 375, 380–81 (N.D. Ill. 1980)). "The typicality requirement may be satisfied even if there are factual distinctions between the claims of the named plaintiffs and those

Case 2:24-cv-01077-JPS    Filed 03/13/26    Page 15 of 24    Document 45

of other class members." *Id*. "Properly applied, these guidelines should uphold the rationale behind the typicality requirement, namely that 'a plaintiff with typical claims will pursue his or her own self-interest in the litigation and in so doing will advance the interests of the class members, which are aligned with the those [sic] of the representative.'" *Insolia v. Philip Morris Inc*., 186 F.R.D. 535 (W.D. Wis. 1998) (quoting 1 Newberg & Conte, *Newberg on Class Actions* § 3.13 (3d ed. 1992)).

Here, both Robillard and Domres and the entire putative class are or have been both under supervision involving GPS monitoring and affected by the same challenged policies. Both Robillard and Domres' claims and the entire putative class' claims are based on the same legal theory—that Defendants' practices and/or policies violate their Fourth Amendment rights. And Robillard and Domres' claims are based on conduct by Defendants that affects both them and the unnamed class members in very similar ways—namely, by them being taken into custody. Put differently, by answering the questions raised by Robillard and Domres' cases—in particular, whether the "tamper" and "strap" alert policies provide for a reasonable suspicion inquiry—one answers the questions raised by the claims of the class at large. Thus, the Court finds Robillard and Domres have claims typical of the class.[2]

### 3.2.4 Adequate Representation

Federal Rule of Civil Procedure 23(a)(4) requires that the named plaintiff "will fairly and adequately protect the interests of the class." "This

---

[2] Defendants argue that because Plaintiffs seek a money judgment for themselves in addition to injunctive relief for the class, their claims are not typical, ECF No. 40 at 18. The Court addresses that argument, as well as Defendants' mootness argument as to Domres, *id.*, in the next section on adequacy, as these concepts are more relevant to adequacy than to typicality.

adequate representation inquiry consists of two parts: (1) the adequacy of the named plaintiffs as representatives of the proposed class's myriad members, with their differing and separate interests, and (2) the adequacy of the proposed class counsel." *Gomez v. St. Vincent Health, Inc.*, 649 F.3d 583, 592 (7th Cir. 2011) (citing *Retired Chicago Police Ass'n*, 7 F.3d at 598).

The Court will begin in reverse order because Defendants do not challenge the second prong of the adequacy analysis related to the proposed class counsel. The Court will pause only briefly to state that Plaintiffs' representations regarding the qualifications and experience of their counsel, ECF No. 39 at 12, are compelling to the Court. Counsel appears to be competent and sufficiently experienced in class actions of this sort. As such, Plaintiffs have met that prong of the adequacy analysis.

As to the remaining prong, the question is whether the named plaintiffs are a "member of the putative class" and have "the same interest and injury as other members." *Santiago v. City of Chicago*, 19 F.4th 1010, 1018 (7th Cir. 2021) (quoting *Beaton v. SpeedyPC Software*, 907 F.3d 1018, 1027 (7th Cir. 2021)). If there are "conflicts of interest, as distinct from differences in entitlements," or if the plaintiffs have a "substantial defense unique to [them]," there may not be adequacy of representation. *Id*. (citing *Beaton*, 907 F.3d at 1027 and *Johnson v. Meriter Health Servs. Emp. Ret. Plan*, 702 F.3d 364, 372 (7th Cir. 2022)).

Beginning with Domres, Defendants argue that she is an inadequate class representative because she is no longer a member of the class. ECF No. 40 at 19–20. The Court agrees, finding Plaintiffs' argument that Domres' status in this case is saved by the "inherently transitory" exception to mootness to be unpersuasive. Under the "inherently transitory" exception to mootness, otherwise moot claims can be saved where "(1) it is uncertain

that a claim will remain live for any individual who could be named as a plaintiff long enough for a court to certify the class; and (2) there will be a constant class of persons suffering the deprivation complained of in the complaint." *Olson v. Brown*, 594 F.3d 577, 581 (7th Cir. 2010) (citing *Gerstein v. Pugh*, 420 U.S. 103, 110 n. 11 (1975)). If both these criteria are met, a named plaintiff who was a member of the class at the time the complaint was filed will be "related back" to the class. *County of Riverside v. McLaughlin*, 500 U.S. 44, 51–52 n.2 (1991) (citing *Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 71 (2013)).

Plaintiffs argue that Domres falls under this exception, such that her claim should be "related back" to the time of filing of the complaint, at which point she was a member of the class. ECF No. 39 at 11 n.2. But this is not a case where it is uncertain whether a class member could maintain a live claim long enough for a judge to certify a class. *Olson*, 594 F.3d at 581. Periods of extended supervision can last *several years* and are determined at the outset. Indeed, Robillard has a 10-year supervision period running from 2020 to 2030, ECF No. 11 at 9, and Domres had a 6-year supervision period running from 2018 to 2024, *id.* at 12. In *Olson*, a large part of the reason the Court found the "inherently transitory" exception applicable was because "the length of incarceration in a county jail generally cannot be determined at the outset and is subject to a number of unpredictable factors, thereby making it inherently transitory." *Olson*, 594 F.3d at 582. That is the "crux" of the exception. *Id*. The same cannot be said here. The length of extended supervision is established at the outset and runs for relatively long periods of time. This case is more akin to *Trotter v. Klincar*, in which the Seventh Circuit described in dicta that the "inherently transitory" exception would not apply where the putative named plaintiff knew precisely when his

claim would become moot and did not move for class certification in that time. 748 F.2d 1177, 1184 (7th Cir. 1984). Here, too, the end of Domres' supervision was well-established, and she knew it was rapidly approaching. She thus was not an appropriate named plaintiff for a class defined in this way. The Court will accordingly dismiss her as a named plaintiff.

Robillard, however, is a different story. Defendants challenge that he seeks money damages, arguing that it opens him up to a unique defense—namely, qualified immunity. ECF No. 40 at 22. This argument fails. The fact that Robillard's damages claim is subject to a unique defense does not make him an inadequate representative.

As an initial matter, the qualified immunity defense would only bear on his ability to proceed on his individual damages claim, and not on his claim for injunctive relief. *Hannemann v. S. Door Cnty. Sch. Dist.*, 673 F.3d 746, 758 (7th Cir. 2012) ("Hannemann is correct; the defense of qualified immunity does not protect defendants from an action for injunctive relief." (citing *Moss v. Martin*, 614 F.3d 707, 712 (7th Cir. 2010) and *Denius v. Dunlap*, 330 F.3d 919 (7th Cir. 2003))). By extension, if he were to lose his claim for damages, particularly because of a qualified immunity defense, he would have more time and, likely, increased motivation to allot squarely to his injunctive relief claim.

More significantly, the underlying concern in the adequacy analysis is that "the named plaintiff will become distracted by the presence of a possible defense applicable only to him so that the representation of the rest of the class will suffer." *J.H. Cohn & Co. v. Am. Appraisal Assocs., Inc.*, 628 F.2d 994, 999 (7th Cir. 1980). But this particular type of defense only deepens Robillard's interest in vigorously litigating this case. His essential

obligation to demonstrate a constitutional violation remains—as it would if all he sought was injunctive relief—but with the specter of qualified immunity looming, he has an obligation to go *further* and demonstrate that the violation was clearly established. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). Put differently, this particular defense does not distract Robillard from the interests of the class; he still has every incentive to present a constitutional violation and simply has an obligation to also go beyond that.

Moreover, and more generally, in keeping with the broader requirements of "adequate representation," Defendants have failed to show that there exists an actual conflict of interest between Robillard's interests and those of the broader class. *Amchem Prod.*, 521 U.S. at 625 (holding that the adequacy of representation inquiry "serves to uncover conflicts of interest between named parties and the class they seek to represent"). Indeed, many courts—including within this circuit—have certified classes where the named plaintiffs seek monetary damages for themselves and declaratory and injunctive relief for the class as a whole, finding no inadequacy of representation. *See, e.g.*, *Curtis v. Voss*, 73 F.R.D. 580 (N.D. Ill. 1976); *Farm Lab. Org. Comm. v. Ohio State Highway Patrol*, 184 F.R.D. 583, 585 (N.D. Ohio 1998) (permitting class certification where "the named plaintiffs seek monetary damages for themselves, [but] they do not seek to certify a class for damages."); *Victory v. Berks County*, No. CV 18-5170, 2019 WL 2950171, at *29 (E.D. Pa. July 8, 2019); *Woodcock v. Correct Care Sols., LLC*, No. 3:16-CV-00096-GFVT, 2019 WL 3068447, at *8 (E.D. Ky. July 12, 2019) ("The named Plaintiffs in this case have asserted claims for damages. [ . . . ] However, the request for class certification pertains only to the claims of injunctive relief."). Defendants simply cannot show a mismatch between what Robillard will be incentivized to show due to his pursuit of damages

and due to his pursuit of injunctive relief on behalf of the class. Robillard is an adequate class representative.

### 3.3    23(b) Requirement

Finally, in order to certify a class, the Court must find that the proposed class satisfies the requirements of at least one of the subsections of Rule 23(b). Subsection (b)(2), invoked by Plaintiffs, requires that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." FED. R. CIV. P. 23(b)(2). The Seventh Circuit has interpreted the Rule to require the contemplated equitable relief to be both "(1) 'appropriate respecting the class as a whole' and (2) 'final.'" *Kartman v. State Farm Mut. Auto. Ins. Co.,* 634 F.3d 883, 892 (7th Cir. 2011) (quoting FED. R. CIV. P. 23(b)(2)). These requirements are "unquestionably satisfied" where, as here, "members of a putative class seek uniform injunctive or declaratory relief from policies or practices that are generally applicable to the class as a whole." *Lippert v. Baldwin*, No. 10 C 4603, 2017 WL 1545672, at *9 (N.D. Ill. Apr. 28, 2017) (quoting *Parsons v. Ryan*, 754 F.3d 657, 688 (9th Cir. 2014)). Here, Plaintiffs seek the same relief for all members—namely, policy changes to bring the Wisconsin Department of Corrections' GPS monitoring processes into compliance with the Fourth Amendment—so this standard has been met.

Defendants argue Rule 23(b)(2) cannot be satisfied because a Fourth Amendment analysis is case specific and looks at circumstances likely to be different for each member. ECF No. 40 at 24. True enough, in *Dukes*, the Supreme Court held that "claims for *individualized* relief . . . do not satisfy the Rule." 564 U.S. at 360. But this case does not implicate individualized claims for relief. Instead, Plaintiffs' class-wide claims seek only injunctive

relief, with the monetary relief being restricted to the named Plaintiffs. Indeed, *Dukes* recognized that "an indivisible injunction benefitting all [of the class] members at once" would fare differently under the rule than an "individualized claim for money." *Id.* at 362–63. Contrary to Defendants' assertion, no individualized assessment is necessary here, as the question is whether the policy itself is unconstitutional. *Id.* at 360 ("The key to the (b)(2) class is the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them." (citation and internal quotation marks omitted)).

Courts in this circuit have routinely certified similar classes, including those operating in the Fourth Amendment context. *See, e.g.*, *Smith v. City of Chicago*, 340 F.R.D. 262, 291 (N.D. Ill. 2021); *Gutierrez v. City of E. Chicago*, No. 2:16-CV-111-JVB-PRC, 2016 WL 5819818, at *15 (N.D. Ind. Sept. 6, 2016), *report and recommendation adopted*, No. 2:16-CV-111 JVB, 2016 WL 5816804 (N.D. Ind. Oct. 5, 2016); *Moreno v. Napolitano*, No. 11 C 5452, 2014 WL 4911938, at *12 (N.D. Ill. Sept. 30, 2014). Finding Rule 23(b)(2) similarly satisfied here, the Court will certify the class described above in this case too.

## 4. ADDITIONAL MATTERS

Also before the Court is Plaintiffs' unopposed motion to restrict, ECF No. 35. In accordance with its March 2025 protective order, ECF No. 28, the Court finds that the documents sought to be restricted—Exhibit 2008 (Monitoring Center Operating Procedures), ECF No. 38, and portions of the deposition of Sarah Wescott-Stinson, ECF No. 37—meet the criteria for designation as "restricted." The Court will order that these documents remain subject to case-participant only restriction.

5.    **CONCLUSION**

For the reasons stated above, the Court will grant the motion for class certification. The Court certifies the following class under Rule 23(b)(2):

> All individuals on extended supervision, parole, or another form of criminal supervision by the Wisconsin Department of Corrections affected by the policy of automatically issuing arrest warrants for individuals subject to GPS monitoring, within the applicable statute of limitations, where the word 'affected' refers to those individuals who were taken into custody as a result of an after-hours 'tamper' or 'strap' alert on a weekend or holiday and who were not subsequently referred for prosecution for tampering with their GPS monitors.

The Court also appoints Plaintiffs' attorneys from the Law Office of Adele D. Nicholas and the Law Office of Mark G. Weinberg as class counsel. With this decision in place, the parties shall engage in settlement negotiations. The parties shall file an interim settlement report by **May 8, 2026**. Any executive summaries for dispositive motions will be due by **April 27, 2026** and any dispositive motions will be due by **June 10, 2026**.

Accordingly,

**IT IS ORDERED** that Plaintiffs Sean Robillard and Sara Domres' motion for class action certification, ECF No. 39, be and the same is hereby **GRANTED**, as modified by this Order;

**IT IS FURTHER ORDERED** that the following plaintiff class be and the same is hereby **CERTIFIED**:

> All individuals on extended supervision, parole, or another form of criminal supervision by the Wisconsin Department of Corrections affected by the policy of automatically issuing arrest warrants for individuals subject to GPS monitoring, within the applicable statute of limitations, where the word 'affected' refers to those individuals who were taken into

custody as a result of an after-hours 'tamper' or 'strap' alert on a weekend or holiday and who were not subsequently referred for prosecution for tampering with their GPS monitors;

**IT IS FURTHER ORDERED** that Plaintiff Sean Robillard be and the same is hereby **APPOINTED** as class representative;

**IT IS FURTHER ORDERED** that Plaintiff Sara Domres be and the same is hereby **DISMISSED** as a named plaintiff from this action;

**IT IS FURTHER ORDERED** that the Law Office of Adele D. Nicholas and the Law Office of Mark G. Weinberg be and the same are hereby **APPOINTED** as class counsel under Rule 23(g);

**IT IS FURTHER ORDERED** that the interim settlement report deadline be and the same is hereby **RESET** to **May 8, 2026**;

**IT IS FURTHER ORDERED** that and the deadline for executive summaries of any dispositive motions be and the same is hereby **RESET** to **April 27, 2026** and the deadline for filing any dispositive motions be and the same is hereby **RESET** to **June 10, 2026**; and

**IT IS FURTHER ORDERED** that Plaintiffs Sean Robillard and Sara Domres' unopposed motion to restrict, ECF No. 35, be and the same is hereby **GRANTED**; the Clerk of Court is directed to maintain the documents at ECF Nos. 37 and 38 under case-participant only restriction.

Dated at Milwaukee, Wisconsin, this 13th day of March, 2026.

BY THE COURT:

_____

J. P. Stadtmueller
U.S. District Judge